# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 3, 2009

Charles R. Fulbruge III
Clerk

No. 07-31163

In The Matter Of:  ELVIN L MARTINEZ

Debtor

------------------------------------------------------------------------

UNITED STATES OF AMERICA

Appellee-Cross-Appellant

v.

ELVIN L MARTINEZ

Appellant-Cross-Appellee

Appeal from the United States United States District Court
for the Eastern District of Louisiana

Before REAVLEY, BARKSDALE, and GARZA, Circuit Judges.

REAVLEY, Circuit Judge:

This appeal presents questions of a limitation bar to income tax adjustments for limited partnerships and the effectiveness of extensions executed by the tax matters partner.  Debtor Elvin L. Martinez seeks to avoid tax liabilities associated with various partnerships for the years 1987 through 1993, which he contends were discharged in his personal bankruptcy because the Internal Revenue Service (IRS) failed to assess the taxes within the three-year

limitations period for doing so. The issue on appeal is whether the limitations period was tolled by actions of the tax matters partner, Walter J. Hoyt, III. The bankruptcy court determined that for the years 1990 to 1993 Hoyt's challenge to the taxes in the tax court precluded the IRS from assessing any tax until completion of those proceedings, and therefore the later assessments for those years were not filed outside the limitations period, and Martinez's liabilities were not discharged. For the years 1987 to 1989, however, the court determined that Hoyt's consents on behalf of the partnership to extend the limitations period were invalid because Hoyt had a disabling conflict of interest of which the IRS was aware, and therefore Martinez's tax liabilities were discharged in bankruptcy. Martinez and the Government cross appeal from the district court's order affirming the bankruptcy court. We AFFIRM the district court's judgment with respect to the years 1990 to 1993, but we REVERSE with respect to the years 1987 to 1989.

## I.

Beginning in the 1970s Walter J. Hoyt, III, formed scores of limited partnerships, ostensibly to engage in the business of breeding cattle and sheep. Although the partnerships owned real livestock, they actually served as abusive tax shelters from which individual tax savings could be achieved through partnership deductions and losses. Hoyt promoted the partnerships to investors around the country, much to his personal gain.

The partnership interests consisted of "units" purchased by investors with cash and promissory notes. The partners also used notes to buy the cattle from Hoyt's family-run cattle operation, which then acted as manager of the herds. The cattle purportedly would produce calves, which could be sold to cover the partnership costs. The herds would also increase in size through the purchase of additional mature cattle. Partnership losses and credits would be passed through to the individual partners to reduce their personal tax liabilities to zero

and to obtain tax refunds. The refunds were used to cover the cost of the investors' investment and to make payments on the promissory notes. Hoyt was the general partner and prepared all of the tax returns for both the partnerships and most of the individual partners through his tax preparation firm.

Since 1980, the IRS and other government agencies had been investigating Hoyt's partnerships because of the suspicion that Hoyt routinely overvalued the cattle in order to achieve excessive depreciation, overstated the number of cattle in existence, and commingled the herd among the different partnerships. In 1989 the IRS unsuccessfully challenged Hoyt's partnerships in *Bales v. Commissioner*,[1] where the tax court held that the partnerships were not shams and that the individual partners were entitled to claim their allowable share of partnership losses. The IRS conducted criminal investigations of Hoyt from April 1984 to August 1987, and from July 1989 to October 1990. In each case the Government decided not to prosecute Hoyt. Hoyt was also investigated from August 1993 to October 1993 and again in September 1995, but each investigation ended without a prosecution. The Government was unable to prevail against Hoyt until 2001, when he was convicted of conspiracy, mail fraud, bankruptcy fraud, and money laundering in connection with partnership activities.

Debtor Martinez became an investor and partner with Hoyt in 1985 and remained involved in four partnerships until 1994. Hoyt was the designated tax matters partner for all of the partnerships and acted accordingly as liaison with the IRS in administrative and litigation proceedings on tax matters concerning the partnerships.[2] Beginning in 1988, the IRS sent numerous notices to Martinez about its concerns with Hoyt's activities and the claimed deductions

---

[1] 58 T.C.M. (CCH) 431, 1989 WL 123005 (1989).

[2] *See* 26 U.S.C. § 6231(a)(7); 26 C.F.R. § 301.6231(a)(7)-1.

and losses on partnerships returns. The notices stated the IRS's belief that purported tax shelter deductions and/or credits were not allowable and that, if claimed, the IRS planned to disallow them. The notices also informed Martinez that the Internal Revenue Code provided for penalties against partners for negligence, overvaluation, and understatement of income on partnership returns, and that if Hoyt claimed the deductions and credits Martinez might wish to seek an adjustment himself. The IRS also sent several notices in 1992 informing Martinez of problems with claimed deductions for passive losses that Hoyt advocated, and it suggested that Martinez might wish to file an amended personal return or consult with an accountant or attorney. Martinez did not respond to the IRS's notices and instead forwarded them to Hoyt.

Generally, when the IRS disagrees with a partnership's claim on a return it has three years in which to audit the return and issue a deficiency notice, known as a Notice of Final Partnership Administrative Adjustment.[3] The period for the tax assessment is then extended for one year after the adjustment.[4] In the instant case, the IRS disagreed with Hoyt's partnership returns for the tax years 1987 to 1989 but was unable to issue timely adjustments. Hoyt, acting as the tax matters partner, granted the IRS extensions of the three-year limitations period, however. The validity of the subsequent adjustments hinges on the validity of the extensions.

The extensions were signed from February 1991 to March 1993. Hoyt granted the first extension of the limitations period for 1987 because an IRS team was already conducting an audit for the years 1980–1986, and he wished to delay the 1987 audit until the earlier examination was complete. In December 1991 the IRS then asked Hoyt to agree to a second extension. It

---

[3] *See* 26 U.S.C. § 6229(a).

[4] *See* 26 U.S.C. § 6229(a) & (d).

believed that without that extension it would have to close its audit and issue adjustments with blanket disallowances of all claimed deductions, but it wished to avoid that circumstance and wanted to obtain further documentation from Hoyt.

At about the same time that it asked for the extension, the IRS also informed Hoyt that it was considering assessing preparer penalties against him. Hoyt responded that he would grant the extensions to issue the adjustments if the IRS would agree to extend the limitations period for assessing the preparer penalties. The IRS finally agreed as part of a settlement in other litigation involving Hoyt's partnerships occurring in federal court in Oregon, where the IRS was seeking to conduct a physical headcount of the cattle. Hoyt agreed to the extensions and gave the IRS until December 31, 1993, to issue the adjustments for the 1987 to 1989 tax years. The IRS issued them before that deadline.

For the tax years 1990 to 1993, the IRS did not need any extensions and issued timely adjustments disagreeing with Hoyt's partnership returns. Hoyt challenged all of the adjustments from 1987 to 1993 by filing petitions in the tax court contesting them. Those challenges were still being litigated at the time the instant action was filed.

In August 2002 Martinez filed a Chapter 7 bankruptcy petition. The bankruptcy court issued a discharge, and the case was closed. The IRS subsequently sent notices of tax deficiency to Martinez for the years 1987 through 1993 in connection with improperly claimed deductions from his membership in Hoyt's partnerships. Martinez then reopened the bankruptcy case in October 2003 to claim that all of his tax liabilities had been discharged. Martinez's theory was that Hoyt had acted under a disabling conflict of interest when, as tax matters partner, Hoyt granted the IRS extensions of the limitations period for the 1987 to 1989 tax years and when he challenged the IRS's

adjustments in the tax court for the 1990 to 1993 tax years. He reasoned that any taxes sought by the IRS were therefore no longer assessable and had been discharged by the bankruptcy proceeding.

After a two-day trial, the bankruptcy court issued a decision separately analyzing the two time periods. First, with respect to 1990 to 1993, the court held that the IRS issued valid adjustments, which Hoyt then challenged by filing timely tax court petitions. Once those petitions were entered on the tax court docket, said the court, the IRS was statutorily precluded from assessing a tax until the conclusion of the tax court proceedings, regardless of any alleged conflict of interest. Because those proceedings were still pending, the court held that the limitations period had been tolled and the tax liabilities for 1990 to 1993 were not discharged.

Second, with respect to 1987 to 1989, the bankruptcy court held that the taxes were no longer assessable and were discharged because when Hoyt had signed the extensions of the limitations period he had a disabling conflict of interest and had breached his fiduciary duty to his partners as the tax matters partner. The court found that internal IRS documents showed that Hoyt was committing fraud and deceiving his partners through his control over all aspects of the partnerships and tax documents. Hoyt's activity included preparing individual partner tax returns reflecting partnership losses when there were problems with shortages of cattle inventory and overvaluation of cattle. The court noted that the IRS was considering imposing return preparer penalties on Hoyt in December 1991 at the same time that it asked Hoyt to sign the extension of the limitations period for the 1987 to 1989 tax years. The court also found that Hoyt attempted to extract a quid pro quo for his agreement to sign the extensions because he conditioned the extensions on the IRS agreeing to extend the limitations period for the assessment of preparer penalties. The court referred to the transcript from the Oregon district court proceedings where Hoyt

consented to the extension after the IRS agreed to forbear assessing preparer penalties until the adjustments issued. Finally, the court concluded that Hoyt was attempting to stall the IRS investigations and the issuance of the adjustments, and it noted that the IRS was concerned about issuing them without obtaining extensions. The court concluded that a delay benefitted Hoyt personally but was contrary to the interests of the partners. The court held that Hoyt was not acting in the interests of his partners when dealing with the IRS, and the extensions of the limitations period were therefore invalid because the IRS knew of the conflict. Because the extensions were invalid, the court held that the limitations period had run and the taxes for 1987 to 1989 were not properly assessable after Martinez filed the bankruptcy petition and were discharged.

Martinez and the Government cross appealed to the district court, which affirmed the bankruptcy court's decision. Both parties now cross appeal to this court.

## II.

We review a district court's affirmance of a bankruptcy court decision by applying the same standard of review to the bankruptcy court decision that the district court applied. *In re OCA, Inc.*[5] "We thus generally review factual findings for clear error and conclusions of law *de novo*."[6]

Ordinarily, a discharge in bankruptcy does not apply to certain specified tax debts.[7] The bankruptcy court held, and we agree, that these non-dischargeable tax debts include taxes that are still assessable after the commencement of the bankruptcy petition, including those taxes for which a tax

---

[5] 551 F.3d 359, 366 (5th Cir. 2008).

[6] *Id.*

[7] *See* 11 U.S.C. § 523(a)(1)(A).

court case was pending at the time of the bankruptcy filing.[8] The question therefore is whether Martinez's tax liabilities for all years at issue, 1987 to 1993, were still assessable at the time he filed his bankruptcy petition in 2002. That question requires reference to the tax laws governing partnerships.

The partnerships at issue are subject to the Tax Equity Fiscal Responsibility Act of 1982 (TEFRA), which prescribes the administrative and litigation procedures for addressing partnership tax issues.[9] Under TEFRA, partnerships file informational returns showing partnership income, gains, losses, deductions, and credits, while individual partners report their pro rata share of tax on individual returns. *Weiner v. United States*.[10] Items which are more appropriately determined at the partnership level than at the individual partner level are treated as "partnership items" for tax treatment at the partnership level, and all other items are treated as nonpartnership items.[11]

While dealing with partnership items, the IRS generally consults with the partnership's tax manager, who is typically designated by the partners and has the authority in most instances to bind the partnership.[12] When proposing adjustments to taxes at the partnership level as a result of an audit, the IRS

---

[8] *See* 11 U.S.C. § 507(a)(8); *Matter of Johnson*, 146 F.3d 252, 256–57 & n.9 (5th Cir. 1998). Section 523(a)(1)(A) of the bankruptcy code excludes from discharge taxes specified in § 507(a)(8), which includes "allowed unsecured claims of governmental units, only to the extent that such claims are for . . . (A) a tax on or measured by income or gross receipts . . . (iii) other than a tax . . . not assessed before, but assessable, under applicable law or by agreement, after, the commencement of the case."

[9] *See* Pub. L. No. 97-248, §402(a), 96 Stat. 648, 653 (1982) (codified as amended at 26 U.S.C. §§ 6221–23).

[10] 389 F.3d 152, 154 (5th Cir. 2004).

[11] *Id.*; *see also* 26 U.S.C. §§ 6221, 6231(a)(3) & (a)(4).

[12] *See* 26 U.S.C. § 6224(c)(3). The tax matters partner is generally defined as "the general partner designated as the tax matters partner as provided in regulations" or, if no general partner has been so designated, as "the general partner having the largest profits interest in the partnership at the close of the taxable year involved." 26 U.S.C. § 6231(a)(7).

issues a notice of adjustment, which is the equivalent of a statutory notice of deficiency given to an individual.[13] The IRS has three years from the later of (1) the date the partnership return is filed or (2) the date that the partnership return is due, to issue an adjustment for a given tax year.[14] This three-year period may be extended, however, by agreement between the IRS and the tax matters partner.[15]

After the IRS issues an adjustment, the tax matters partner has 90 days to seek a readjustment by filing a petition in the tax court, the Court of Federal Claims, or a United States district court.[16] When a petition is filed in tax court, the limitations period for assessing a tax is suspended until the decision of the tax court becomes final and for one year thereafter.[17]

## III.

With these background principles in mind, we address first Martinez's appeal before turning to the Government's cross appeal. Martinez appeals the

---

[13] 26 U.S.C. § 6223(a); *see PAA Mgmt., Ltd. v. United States*, 962 F.2d 212, 214 (2d Cir. 1992).

[14] 26 U.S.C. § 6229(a). The statute provides:

General rule.--Except as otherwise provided in this section, the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of--

(1) the date on which the partnership return for such taxable year was filed, or

(2) the last day for filing such return for such year (determined without regard to extensions).

*Id.*

[15] 26 U.S.C. § 6229(b).

[16] 26 U.S.C. § 6226(a).

[17] 26 U.S.C. § 6229(d).

district court's decision to affirm the bankruptcy court concerning the tax years 1990 to 1993. He contends that although Hoyt filed tax court petitions challenging the IRS's adjustments for 1990 to 1993, Hoyt had a serious conflict of interest with his partners that barred him from acting on behalf of the partnership. He reasons that the 1990 to 1993 petitions were therefore invalid and did not toll the limitations period for assessing taxes for those years. Because the limitations period had run by the time he filed his bankruptcy petition, Martinez contends that his tax liability for those years was discharged. We have little trouble disposing of this part of the case.

As noted above, the three-year statute of limitations for assessing a tax attributable to partnership items is suspended when a tax court petition is filed.[18] What is more, once a tax court proceeding has begun the IRS is expressly prohibited by statute from assessing a tax until the decision of the tax court becomes final.[19] This statutory scheme provides no room for Martinez's argument, as he does not contest that the IRS issued timely adjustments or that Hoyt filed timely challenges in the tax court. Once Hoyt invoked the tax court process to contest the adjustments, the limitation period was suspended until

---

[18] *Id.*

[19] 26 U.S.C. § 6225(a). The statute provides in relevant part:

Restriction on assessment and collection.--Except as otherwise provided in this subchapter, no assessment of a deficiency attributable to any partnership item may be made (and no levy or proceeding in any court for the collection of any such deficiency may be made, begun, or prosecuted) before--

(1) the close of the 150th day after the day on which a notice of a final partnership administrative adjustment was mailed to the tax matters partner, and

(2) if a proceeding is begun in the Tax Court under section 6226 during such 150-day period, the decision of the court in such proceeding has become final.

*Id.*

that process was concluded, regardless of the validity of Hoyt's status as tax matters partner or the existence of any deficiency in the petitions. We are not the first court to so hold.

The Ninth Circuit has similarly held that a tax assessment was not barred by the limitations period where a tax matters partner filed a tax petition on behalf of a partnership at the time that his status was a legal nullity due to his previously filing a personal bankruptcy petition. *O'Neill v. United States*.[20] Although the tax court later dismissed the petition for lack of jurisdiction, the Ninth Circuit held that the petition "served to suspend the limitation period because there was an existing unresolved matter before the Tax Court."[21] The Ninth Circuit followed the reasoning of a Second Circuit case that addressed a predecessor tax provision and concluded that a petition placed on the docket of the Board of Tax Appeals suspended the limitations period even though the petition was later determined to have a jurisdictional defect. *See Am. Equitable Assurance Co. v. Helvering*.[22]

Although Martinez argues that *O'Neill* and *American Equitable* are distinguishable because they did not involve a tax manager's alleged conflict of interest, their reasoning is applicable. Whether a tax matters partner actually has a disabling conflict of interest when he files tax petitions would by necessity be an issue addressable by the tax court when considering the petitions. But because the IRS may not assess a tax while the tax court proceedings are pending, *see* § 6225(a), under Martinez's theory, the IRS could be barred from assessing a properly owed tax merely if the tax court is fortuitously unable to adjudicate the petition before the limitations period has run. We agree with the

---

[20] 44 F.3d 803, 805–06 (9th Cir. 1995).

[21] *Id.* at 806.

[22] 68 F.2d 46, 47 (2d Cir. 1933).

11

Ninth Circuit that "this is not what Congress intended."[23] We therefore conclude that the bankruptcy court and the district court properly determined that the limitations period was tolled for the 1990 to 1993 tax years, and Martinez's tax liability for those years was therefore not discharged in the bankruptcy proceeding.

## IV.

We turn now to the Government's cross appeal. The Government challenges the determination below that Hoyt was acting under a disabling conflict of interest that rendered invalid the extensions for the limitations period on the 1987 to 1989 tax years. We have not previously addressed whether a conflict between a tax matters partner and the remaining partners may disable the tax manager's actions with respect to the partnership and, if so, the parameters of such a conflict. We agree with other circuits that have addressed the matter and determine that there may be times when a tax matters partner's actions beneficial to himself are so contrary to the interests of the partnership that they are rendered null with respect to the partners. But we hold that under the circumstances present the court should not burden the IRS with a decision so as to nullify actions taken with the tax matters partner.

It is settled law that a tax matters partner owes a fiduciary duty to his partners.[24] In light of this fiduciary duty, other circuits have held that when he has a severe conflict of interest with his partners that is known to the IRS, he

---

[23] *O'Neill*, 44 F.3d at 806. *See also Martin v. Comm'r*, 436 F.3d 1216, 1223–24 (10th Cir. 2006) (addressing tolling under 26 U.S.C. § 6503, the analogous statute applicable to the limitations period as applied to an individual taxpayer, and holding that "the placing of a proceeding on the docket of the tax court, not the manner in which such a proceeding is resolved, is key to tolling the running of the statute of limitations").

[24] *See Phillips v. Comm'r*, 272 F.3d 1172, 1175 (9th Cir. 2002)*; Transpac Drilling Venture 1982-12 v. Comm'r*, 147 F.3d 221, 225 (2d Cir. 1998); *Computer Programs Lambda, Ltd. v. Comm'r*, 89 T.C. 198, 205 (1987).

may not bind the individual partners and the partnership by his dealings with the Government.[25]

The tax matters partner "is the central figure of partnership proceedings" and "serves as the focal point for service of all notices, documents and orders on the partnership."[26] He is required to keep the remaining partners informed of administrative and judicial proceedings, and his actions may be binding on the partnership.[27] He serves as the representative of all partners vis á vis the IRS.[28] As explained by the tax court, "[t]he detailed statutory procedures for partnership level audits and litigation contemplate the continual presence of one tax matters partner, and the procedures cannot operate unless the tax matters partner is capable of acting on the partnership's behalf regardless of his personal tax posture."[29] If the tax manager's fiduciary duty to his partners is compromised by a conflict with his own tax situation, his actions are properly voided in order to protect those partner and partnership interests otherwise served by him.[30]

---

[25] *See Phillips*, 272 F.3d at 1175; *Transpac Drilling*, 147 F.3d at 227–28.

[26] *Lambda*, 89 T.C. at 205.

[27] *Id.*; *see also* 26 U.S.C. § 6229(b)(1)(B) (providing that the limitations period for assessing a tax attributable to partnership items may be extended "with respect to all partners, by an agreement entered into by the Secretary and the tax matters partner").

[28] *See Transpac Drilling*, 147 F.2d at 225 ("By centralizing tax-related proceedings of the partnership in one person or entity, Congress created a statutory analogue of the class representative in class action proceedings.").

[29] *Lambda*, 89 T.C. at 205.

[30] *See Phillips*, 272 F.3d at 1175 ("Trust law, generally, invalidates the transaction of a trustee who is breaching his trust in a transaction in which the other party is aware of the breach." (citing RESTATEMENT OF TRUSTS §§ 288–297)); *Transpac Drilling*, 147 F.3d at 225 (noting that "limited partners secure their due process protection as a result of the fact that the TMP stands in a fiduciary relationship toward them").

We are unpersuaded by the Government's contention that because Treasury regulations governing the designation and removal of a tax matters partner do not specify that a conflict of interest is a reason for removing him, deference to the regulations makes it improper to hold that the IRS may not rely on a conflicted tax manager's grant of an extension of the limitations period.[31] The Internal Revenue Code grants the Secretary authority to promulgate regulations that serve the efficient administration of the tax laws.[32] But the absence of a specific regulation addressing conflicts of interest does not mean that a tax matters partner's actions may bind the partnership irrespective of a conflict. We agree with the Second Circuit that "[t]he elimination of conflicts, even if not addressed in the existing regulations, is surely an appropriate concern to the effective and efficient administration of the tax laws."[33] Thus, "where serious conflicts exist, a [tax matters partner] may be barred from acting on behalf of the partnership,"[34] and we may not ignore an egregious situation and defer to the IRS the discretion to choose whether to rely on a tax matters partner's position that is known to be adverse to that of the partnership.

The Second Circuit was addressing such a conflict in *Transpac Drilling*. The court there found that a disabling conflict of interest invalidated three tax managers' consents to extend the limitations period even though the IRS chose not to exercise its regulatory authority to remove the tax matters partners. In that case, the IRS was conducting civil audits of multiple partnerships as illegitimate tax shelters at the same time that there were ongoing criminal

---

[31] *See* Treas. Reg. § 301.6231(a)(7)-1 (providing for designation and termination of a tax matters partner).

[32] *See Transpac Drilling*, 147 F.3d at 227; *see also* 26 U.S.C. § 6231(c) (authorizing the Secretary to determine areas of "special enforcement consideration[]."

[33] *Transpac Drilling*, 147 F.3d at 228 n.9.

[34] *Id.* at 227.

investigations of the partnerships' promoter and three tax matters partners.[35] The IRS initially sought extensions of the statute of limitations for the civil audits from the limited partners, who refused to grant the extensions.[36] The IRS then requested the extensions from the tax managers, who knew that they were being investigated and who were also cooperating with the Government in its case against the promoter.[37] The tax managers granted the extensions. The Second Circuit held that the extensions were invalid because the criminal investigations gave the tax matters partners "powerful incentive to ingratiate themselves to the government" and created "overwhelming pressure . . . to ignore their fiduciary duties to the limited partners."[38] The court found "especially disquieting" the fact that the IRS *knew* the limited partners did not want to grant extensions before it asked the tax managers to give it what the partners had already denied.[39]

The Second Circuit subsequently clarified that its holding in *Transpac Drilling* was based on the presence of a clear and actual conflict. *Madison Recycling Assocs. v. Comm'r.*[40] In *Madison Recycling,* the court found no disabling conflict of interest where there was no evidence that the tax matters partner had incentive to ingratiate himself to the IRS, either because he was a prospective witness seeking immunity or was a known target of a criminal investigation.[41] The court concluded that unless the tax matters partner was

---

[35] *Id.* at 223–24.

[36] *Id.* at 224.

[37] *Id.* at 223–24.

[38] *Id.* at 227.

[39] *Id.*

[40] 295 F.3d 280, 288 (2d Cir. 2002).

[41] *Id.* at 289.

aware of the existence or prospect of a criminal investigation, it could not see how his personal concerns could have influenced him and prevented the proper discharge of his fiduciary duties to the limited partners.[42] Thus, a disabling conflict of interest will be shown only when the tax matters partner has cause to prefer his own interests above his fiduciary duties, and the IRS knows that his actions are more than likely contrary to the wishes and interests of the limited partners.

In the instant case, we find that the circumstances do not support a similar finding that Hoyt acted under a disabling conflict when he granted the extensions to the IRS. Unlike *Transpac Drilling*, where the "facts of the matter [spoke] for themselves," here the same sort of overwhelming circumstances and knowledge by the IRS that made inescapable a finding of a conflict are absent.[43] There is no indication that the IRS attempted to obtain extensions from the partners before turning to Hoyt, or that the partners were opposed to the extensions. Hoyt was also not under criminal investigation at the time that he executed the extensions of the limitations period. Although he had been under criminal investigation earlier, that fact alone does not create a disabling conflict.[44] Moreover, there is no indication that when he granted the extensions Hoyt feared another criminal investigation, and there is no evidence of Hoyt's thought process that would indicate a desire to "ingratiate [himself] to the government."[45]

---

[42] *Id.*

[43] *See Transpac Drilling*, 147 F.3d at 227 ("That the TMPs' interests and those of the ones who would be bound by their actions were in severe conflict cannot be doubted.").

[44] *See River City Ranches # 1 Ltd. v. Comm'r*, 401 F.3d 1136, 1142 (9th Cir. 2005) (*River City Ranches II*); *Phillips*, 272 F.3d at 1174.

[45] *Transpac Drilling*, 147 F.3d at 227.

16

The bankruptcy court held that Hoyt was operating under a disabling conflict of interest for three reasons. It inferred from each that Hoyt was not acting in the interests of his partners when dealing with the IRS and that the IRS knew this fact. First, the court found that Hoyt was defrauding his partners. The court cited internal IRS memoranda detailing Hoyt's fraudulent accounting practices, including the overvaluation of cattle and over counting of the livestock. The documentation does show that the IRS viewed Hoyt's partnerships and accounting practices as mere shams to perpetuate his cattle operations and fraudulently avoid taxes. Many of the documents cited by the court, however, predated or were close in time to the tax court's decision in *Bales*. In that case, the IRS challenged, *inter alia*, Hoyt's depreciation methods and his valuation of cattle, as well as the partners' ability to claim deductions for partnership losses on their returns.[46] The tax court rejected the IRS's position and concluded that the cattle partnerships were profit-seeking businesses rather than economic shams and that the partners were permitted their allowable share of partnership items and losses.[47] Although Hoyt may ultimately have defrauded his partners and the IRS in connection with the partnerships, at the time that the IRS was seeking the extensions in this case, it had already been rebuffed in its effort to prove this fact. Testimony at trial revealed that the IRS believed the *Bales* case had partly legitimized Hoyt's operations and affected how it viewed the case. Although it believed the partnerships were shams, the IRS also believed as a direct result of *Bales* that it had to obtain much stronger evidence to perform a successful audit. It is therefore not obvious that the IRS should have known at the time of the extensions that Hoyt had a disabling conflict with respect to the partnerships at issue in this case.

---

[46] *See Bales*, 1989 WL 123005, at *1.

[47] *Id.* at *27–29.

The bankruptcy court noted that on December 12, 1991, the IRS notified Hoyt that it was considering imposing return preparer penalties for willful or reckless conduct. This notice to Hoyt concerned returns for the 1989 and 1990 tax years and was almost two years after the *Bales* decision. It is not clear, however, that the potential for assessment of preparer penalties on Hoyt tainted Hoyt's grant of an extension of the limitations period. We do not think the mere risk of preparer penalties in this case, unlike say an indictment, provided the kind of "powerful incentive" for Hoyt to act contrary to his partners' interest. We do not hold that a threat of penalties may never cause a conflict between a TMP and his partners. But here Hoyt had been battling the IRS for over a decade and had previously prevailed in *Bales*. It is therefore not apparent that the IRS viewed its threat of penalties, apart from a criminal investigation, as causing overwhelming pressure for Hoyt to ignore his fiduciary duties.

The bankruptcy court's second basis for finding a disabling conflict was that Hoyt attempted to extract a quid pro quo from the IRS in connection with the preparer penalties. Hoyt agreed to extensions of the limitations period for the 1987 to 1989 tax years in February 1991, July 1992, and March 1993. The extension that was eventually granted in July 1992 originated with the IRS's request in December 1991, at the same time that the IRS had threatened to impose the preparer penalties for 1989 and 1990. Hoyt said he would not agree to an extension unless the IRS agreed to extend the limitations period for assessing preparer penalties against him and other preparers who worked for him, including his brother-in-law Henry Nathaniel. On its face, this request made little sense because, if granted, it would merely give the IRS more time to assess penalties against Hoyt. Nevertheless, the IRS refused to connect an extension of the limitations period for issuing the adjustments for 1987 to 1989

with an extension on the time for assessing preparer penalties.[48] Subsequently, however, in June 1992 the IRS agreed to forbear assessing penalties until the time for issuing the adjustments, and Hoyt signed the extensions in July 1992.

We find this purported quid pro quo insufficient to substantiate a conflict under the facts of this case. IRS revenue agent Norm Johnson testified that at the time the IRS agreed to Hoyt's request it had already determined that it would not seek preparer penalties against Hoyt. Agent Johnson testified that it therefore did not matter to the IRS whether to extend the preparer penalties because it believed they were not worth pursuing. He also explained that in July 1992 the IRS could not have assessed preparer penalties against Hoyt because the audits upon which the penalties would have been based were incomplete. In other words, under the normal process for assessing preparer penalties it would be premature to seek penalties before the audits were sufficiently complete to know that penalties were appropriate. In order for there to be a true quid pro quo, the parties must each exchange valuable concessions. *See United States v. Robinson*.[49] There must be a mutuality of advantage and a mutuality of disadvantage.[50] That did not exist here because the IRS essentially gave up nothing, and Hoyt obtained nothing of true value.

The bankruptcy court correctly noted that Hoyt apparently believed he was receiving something of value, but Hoyt's perception does not necessarily mean that he was acting in conflict with his partners. Agent Johnson testified that although the partnerships derived no benefit from delaying preparer penalties against Hoyt, there was also no harm, and Martinez fails to identify

---

[48] In fact, according to the trial testimony, the IRS went forward and assessed certain penalties against Nathaniel.

[49] 582 F.2d 1356, 1366 (5th Cir. 1978) (en banc).

[50] *Id.*

sufficiently a detriment to the partnerships.[51] Given that Hoyt obtained nothing of true value and that what he did obtain was not contrary to the interests of the partnerships, we think the alleged quid pro quo is too slender a reed to support a conclusion that the IRS knew Hoyt was placing his interests above those of his partners.

The final basis for the bankruptcy court's finding of a conflict was that Hoyt was attempting to stall the IRS and delay the issuance of the final adjustments. This finding was based on the conclusion that it was in Hoyt's interest to delay the issuance of the adjustments as long as possible, but it was in the partners' interest to have the proceedings completed quickly. The court relied in part on a Ninth Circuit decision that also involved Hoyt and allegedly invalid extensions on the limitations period for issuing adjustments. *See River City Ranches # 1 Ltd. v. Comm'r*.[52]

That case, known as *River City Ranches II*, concerned similar extensions that Hoyt granted to the IRS but for different partnerships. The Ninth Circuit remanded to the tax court for discovery on whether Hoyt acted under a disabling conflict.[53] Although it did not hold that there was a conflict, the Ninth Circuit speculated that the partners might have opposed an extension on the limitations period and preferred quickly issued adjustments because the sooner the IRS issued them, the more difficult it would be for the IRS to defend them.[54] It also noted that even if the IRS was able to defend the adjustments, it would be in the

---

[51] *See Madison Recycling*, 295 F.3d at 288 (noting that the tax payer must show that an extension of the limitations period is invalid and that the burden of persuasion "remains always with the taxpayer").

[52] 401 F.3d 1136 (9th Cir. 2005).

[53] *Id.* at 1143.

[54] *Id.*

partners' interest to avoid delay in order to minimize penalties and interest.[55] Finally, the court reasoned that it would be in the partners' interest to learn from the adjustments that Hoyt was "looting the partnerships," noting that adjustments issued for other partnerships had prompted partners to withdraw and initiate civil suits against Hoyt.[56] In contrast, the court noted that Hoyt's preference would be to delay the issuance of adjustments in order to avoid tension with his partners and perpetuate his fraud for as long as possible.[57] Here, the bankruptcy court found this reasoning persuasive and held that Hoyt's pattern of delay and non-cooperation with the IRS indicated a disabling conflict of interest in granting the extensions.

Although in hindsight Hoyt may have wanted to delay the adjustments for his own reasons, we think that in light of all the circumstances the grant of the extensions was not the kind of action that should have prompted the IRS to believe that Hoyt's interests were contrary to those of his partners. We think it is incorrect to say categorically that the partners and Hoyt had divergent interests as to when the adjustments were issued. Any difficulty that the IRS might have had in subsequent tax court proceedings in defending adjustments issued without an extension could have benefitted both Hoyt *and* the partners because, as in the *Bales* case, a loss by the IRS would allow Hoyt's business to continue and allow the partners to take their deductions. Furthermore, both Hoyt and the partners would still risk losing any subsequent tax court proceedings because the IRS could have continued to press the adjustments and urge the tax court to determine partnership items. *See PAA Mgmt., Ltd. v.*

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

*United States.*[58] But Agent Johnson testified that the extensions for the adjustments could have been beneficial to the partners (as well as Hoyt) because they could have given the partnerships more time to document and support any legitimate deductions. In short, we think the speculation about the effect of the adjustments cuts both ways, and we are not willing to hold as a matter of law that there was a disabling conflict.

We are also not persuaded that the adjustments necessarily would have given the partners notice of Hoyt's fraud so as to influence a decision to take protective action. In this case, the IRS sent numerous notices to Martinez informing him of its view that Hoyt had taken improper deductions in preparing the partnership returns. Martinez contends that there was no specific notice of Hoyt's lying about the value and number of cattle. Beginning in 1988, however, the IRS informed Martinez that it believed Hoyt's claimed deductions and credits were not allowable, and it referred to penalties for overvaluation. It also advised Martinez that he may wish to seek his own adjustment or to consult with an accountant or attorney. The record contains an affidavit from Martinez showing that as late as September 1993 Martinez maintained, based in part on the *Bales* case, that the partnerships were not abusive tax shelters. He specifically referred to his belief that the cattle had not been overvalued. Martinez also testified before the bankruptcy court that he was aware the IRS took the position that there was a problem with the size of the cattle herd. Yet Martinez took no action of his own to address these matters. We therefore do not see that the IRS knew Martinez's interests diverged from those of Hoyt or

---

[58] 962 F.2d 212, 218–19 (2d Cir. 1992) ("The FPAA is not 'final' in the sense that its issuance necessarily obviates the need for further information, brings the curtain down on the IRS's administrative or investigative role, or muzzles the IRS from requesting that the court invoke its authority finally to determine partnership items.").

that he had a significant conflict with Hoyt over adjustments issued without an extension.[59]

The evidence here showed that the IRS firmly believed Hoyt was dishonest and held that belief almost from the time it began auditing him in 1980. But the IRS's ability to deal with a tax matters partner and rely on his actions on behalf of the partnership is critical for the effective operation of the current tax system. The circumstances here did not reveal to the IRS a substantial gulf between the tax matters partner's interests and the interests of the partners. The grant of an extension on the limitations period is often "a routine accommodation—signing a waiver in order to avoid immediate assessment by the IRS."[60] We do not think the totality of the circumstances in this case clearly revealed to the IRS the tax matters partner's inherent conflict and incentive to breach his fiduciary duty to the partnership.

---

[59] Following the Ninth Circuit's remand in *River City Ranches II*, the tax court found that Hoyt had a disabling conflict when granting extensions on the limitations period but ruled in favor of the Government on other grounds. *See River City Ranches #1 Ltd. v. Comm'r*, 94 T.C.M. (CCH) 1, 2007 WL 1891595 (2007) (*River City Ranches III*). The tax court found a conflict essentially by adopting the reasoning upon which the Ninth Circuit had speculated in *River City Ranches II*, i.e. that it was in the partners' interest to have the adjustments issued sooner rather than later. The tax court cited the cattle headcount as evidence of the IRS's knowledge of Hoyt's fraud but cited no evidence establishing what was in the partners' interest. *See id.* at *13–14. In this case, as noted above, Agent Johnson testified that the extensions on the adjustments could have benefitted the partners by giving the partnerships a chance to document legitimate deductions. He also testified that matters are typically settled at the administrative level faster than if a case proceeds to tax court. That being so, it could have been in the partners interest to extend the audits and adjustments because they might reach a quicker settlement and thereby realize savings of interest and penalties. It is not so speculative to think the extension of the adjustments potentially could have resulted in this benefit to the partners given that the tax court cases for the 1987 to 1989 tax years were still pending when Martinez filed the instant adversary action in 2003. In any event, we note that the Ninth Circuit recently affirmed the tax court's decision in *River City Ranches III* but did not reach the question of Hoyt's conflict of interest. *River City Ranches v. Comm'r*, 2009 WL 498662, at *2 n.6 (9th Cir. Feb. 26, 2009) (unpublished).

[60] *Phillips*, 272 F.3d at 1175.

For the foregoing reasons we AFFIRM the district court's affirmance of the bankruptcy court's holding that Martinez's tax liabilities were not discharged for the years 1990 to 1993. We REVERSE the court's holding that the tax matters partner's grant of extensions of the limitations period were invalid and that Martinez's tax liabilities were discharged for the years 1987 to 1989. It is the judgment of this court that none of these tax liabilities has been discharged.